Jason S. Brookner
State Bar No. 24033684
Monica S. Blacker
State Bar No. 00796534
**ANDREWS KURTH LLP**
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone: (214) 659-4400
Facsimile: (214) 659-4401

**PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BROADSTAR WIND SYSTEMS | § | Case No. _____ |
| GROUP LLC, *et al.*, | § | |
| | § | Joint Administration Pending |
| Debtors. | § | |

### DECLARATION OF ROY C. KING IN SUPPORT OF
### CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Roy C. King declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:[1]

### I.    INTRODUCTION

1.    I am the Chief Executive Officer of BroadStar Wind Systems Group LLC, one of the above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors," "BroadStar" or the "Company").[2] I have served in that capacity since March 2010.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the relevant First Day Motion (as defined herein).

[2] The Debtors in these chapter 11 cases, along with the last four (4) digits of their taxpayer identification numbers, are: BroadStar Wind Systems Group LLC ("BWSG") (2489), Broadstar Wind Systems Management LLC ("BWSM") (8805), Broadstar Wind Systems LP ("BWS") (8806), BroadStar Developments Management LLC ("BDM") (8582), BroadStar Developments LP ("BD") (8597). The Debtors' corporate headquarters are located at 1323 North Stemmons Freeway, Dallas, Texas 75207.

2. On this date (the "Petition Date") and concurrently with the filing of this Declaration, each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. In order to enable the Debtors to operate effectively, to smooth the transition into chapter 11, and to avoid any potential adverse effects as a result of the commencement of these chapter 11 cases, the Debtors have requested various types of relief in several "first-day" pleadings filed with the Court (the "First Day Motions").

3. I submit this Declaration in support of the Debtors' First Day Motions. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my experience with and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## II. BACKGROUND

### A. Company and Business Overview

4. The Company was organized as a Delaware limited liability company on December 16, 2008. The Company has an interest in four subsidiary entities: (i) a 99% interest in BroadStar Wind Systems LP ("BWS"); (ii) a 100% interest in BroadStar Wind Systems Management LLC which owns the remaining one percent interest in BWS; (iii) a 99% interest in BroadStar Developments LP ("BD"); and (iv) a 100% interest in BroadStar Developments Management LLC which owns the remaining one percent interest in BD.

5. Pursuant to a certain Purchase Agreement dated March 13, 2009 by and between the Company and BroadStar Investment Company LLC ("BICO"), BICO invested a total of $6

million in the Company in exchange for a membership interest in the Company. BICO's initial Percentage Interest was set at 50.42% with an automatic increase to as much as 66.667% in the event that certain EBITDA targets were not met. The remaining members of the Company, and their respective Percentage Interests, are: (i) BroadStar Energy, LP ("BELP") with a Percentage Interest of 33.71% (with a potential reduction to as low as 22.667%), (ii) BroadStar Group LLC ("BG"), with a Percentage Interest of .99% (with a potential reduction to as low as .666%), and (iii) T.G. Stephens Capital, L.L.C. ("TGS") with a Percentage Interest of 14.87% (with a potential reduction to as low as 10.00%).

6. In January 2010, the Company approved a rights offering whereby existing members were afforded the opportunity to make secured loans to the Company in an amount not to exceed $2.0 million in the aggregate in proportion to their then respective Percentage Interests (the "Rights Offering"). BICO and BELP chose to participate, but BG and TGS did not. During the period commencing January 27, 2010 and ending May 10, 2010, BICO made secured loans aggregating $1.75 million, and BELP made secured loans aggregating $330,000.

7. The Company is a distributed wind generation company focused on the development of wind turbines for on-site electrical power generation for commercial, government and industrial buildings. The Company is also a development stage company with development engineering capabilities, but without production engineering capabilities. The Company does not have a wind turbine ready for commercial production, and even with adequate funding, is unlikely to have such a marketable product until the first quarter of 2011. As a result of substantial delays and unexpected costs incurred in product development, the Company was compelled to eliminate its marketing resources. On May 10, 2010, the Company entered into a Distributor Agreement with BroadStar Wind Distributors LLC ("Distributors") for

the exclusive right to distribute the Company's turbines, when built, in the United States. Distributors has agreed to develop a nationwide dealer network and/or internal sales force, and to make minimum purchases of the Company's turbines.

8. The Debtors are headquartered in Dallas, Texas, and currently have approximately nineteen (19) employees.

### B. Capital Structure

9. The Debtors do not have any publicly traded debt or securities. Prior to the Petition Date, the Debtors financed their operations through equity contributions and borrowings pursuant to the Rights Offering under a series of Secured Promissory Notes (as modified, amended or supplemented from time to time prior to the Petition Date, the "Prepetition Loan Documents"), among BWSG as borrower, and the other Debtors as guarantors, and from BICO and BELP (the "Prepetition Lenders").

10. As of the Petition Date, the Debtors owed the Prepetition Lender approximately $2.08 million (including accrued but unpaid interest) (the "Prepetition Secured Debt") under the Prepetition Loan Documents. The Prepetition Secured Debt is secured by a lien on substantially all of the Debtors' assets, including their membership interests in the subsidiary entities (the "Prepetition Collateral").

11. The Debtors are in default under the Prepetition Loan Documents.

### C. Sale Efforts

12. The Debtors employed Ewing Bemiss & Co. to market the assets and/or raise additional capital to fund the Debtors' operations prior to the Petition Date. Specifically, a Confidential Information Memorandum dated February 2010 was distributed to interested parties. Given the status of the patent litigation described below, it was difficult for the Debtors to generate any serious interest.

D. **Prepetition Litigation**

13. On February 11, 2010, BWSG instituted suit against Thomas Stevens in the 191st Judicial District Court of Dallas County. On February 24, 2010, Defendant Thomas Stevens removed the action (the "Litigation") to the United States District Court for the Northern District of Texas Dallas Division (the "District Court"), Civil Action No. 10-CV-0369-F.

14. The Litigation revolves around the Company's ownership of various intellectual property, including a customized pitch calculator program and the AeroCam$^{TM}$ technology, research and testing, that is integral to the Debtors' ability to continue to develop wind turbines. The Litigation also involved requests by BWSG to Defendant to return proprietary corporate property.

15. On April 19, 2010, Defendant filed counterclaims against the Company and others alleging fraud, breach of fiduciary duties and similar claims. The Litigation is before the Hon. Judge Royal Furgeson; trial is scheduled for October 2010.

16. To the extent necessary, the Debtors will be filing a Motion for Relief from the Automatic Stay to allow the Litigation to proceed to judgment in the District Court; however any enforcement of the judgment against the Debtors will be brought before the bankruptcy court.

E. **The Chapter 11 Filings**

17. In light of the uncertainties posed by the pending Litigation, the Prepetition Lenders were unwilling to make any further loans to the Company outside of a DIP Financing context. Without additional funding, the Debtors would not be able to make certain necessary payments to keep the business operating, including but not limited to payroll, rent and other operating expenses.

18. After careful consideration of all available alternatives, the Debtors determined that commencing these chapter 11 cases was the best way to maximize the value of the business and recoveries for all of the Debtors' stakeholders.

### III. FIRST DAY MOTIONS AND ORDERS

19. Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions, seeking the entry of certain orders which the Debtors believe are necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity. A description of the relief requested in the First Day Motions, and the facts supporting entry of the relief requested therein, are discussed below.

#### A. Administrative and Procedural Matters

##### (i) Motion for Joint Administration

20. By their respective Motions Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motions"), each of the Debtors is requesting that their estates be jointly administered pursuant to Bankruptcy Rule 1015 and Rule 1015.1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

21. The Debtors are all "affiliates," as that term is defined in section 101(2) of the Bankruptcy Code, by virtue of the fact that, as set forth above, BSWG owns directly or indirectly 100% of the equity or ownership interests in all of the other Debtors.

22. The finances of the Debtors are also significantly related such that joint administration will expedite and foster each of the Debtors' reorganization efforts. Separate books and record for each of the Debtors are, and will continue to be, kept in the ordinary course

of business, and each of the Debtors will file its own schedules and statements of financial affairs.

23. In order to optimally and economically service these cases, the Debtors request that their cases be jointly administered, for procedural purposes only, under the case number and caption assigned to BroadStar Wind Systems Group LLC. I believe that joint administration will reduce the costs and fees associated with administering these chapter 11 cases, thus benefiting the Debtors' estates and creditors as, among other things, the need to file duplicative notices, motions, applications and orders will be obviated. To that end, joint administration will also serve to streamline administration of these cases for the Court and the Office of the U.S. Trustee.

24. Further, as stated in the Joint Administration Motions, I do not believe that jointly administering these cases will adversely affect creditors of the Debtors. The consolidation sought is administrative only, not substantive, and creditors of the Debtors will still be required to file claims against their respective Debtor.

**(ii) Motion for Extension of Time to File Schedules**

25. The Debtors are a complex enterprise, comprised of five (5) affiliated debtor estates with aggregate debts in excess of $3 million. In the weeks leading up to the Petition Date, the Debtors' key business personnel have been working diligently on attempting to avoid the need to file for chapter 11, and have been preoccupied with litigation, attempts to sell the Company, and related matters. As a result, and due to the "last minute" and "last resort" nature of these chapter 11 cases, the Debtors have not had the necessary time and resources available to review the volumes of material that are necessary to create meaningful and accurate Schedules and Statements by the dates required by Bankruptcy Rule 1007. As a result, the Debtors are requesting an additional thirty (30) days beyond the fourteen (14) days afforded by the

Bankruptcy Rules within which to file their Schedules and Statements, to and including June 24, 2010.

B. **Stabilization of Business Operations**

26. During their stay in chapter 11, the Debtors intend to continue operating as debtors in possession and, as a result, need to stabilize the business and ease the transition into chapter 11 for the business and its employees. The relief requested in the motions set forth below is intended to accomplish this goal and to ensure that value is maintained and preserved pending Plan confirmation.

(i) **Motion to Maintain Bank Accounts and Business Forms**

27. By their Motion for Order Pursuant to Sections 345, 363, 1107 and 1108 of the Bankruptcy Code Authorizing Continued Use of Existing (a) Bank Account and (B) Business Forms (the "Cash Management Motion"), the Debtors request (i) authority to maintain their existing bank account and business forms.

28. As set forth more fully in the Cash Management Motion, the Debtors' cash management system is relatively simple in that, in the ordinary course of business, the Debtors maintain only one bank account (the "Bank Account") for all deposits and disbursements. The Bank Account is maintained at JPMorgan Chase Bank in Dallas, Texas, and the Debtors desire to continue to maintain and use such Bank Account in the ordinary course of business on a post-petition basis, consistent with their past practices.

29. To minimize expenses and interruption to the business, the Debtors request that they be authorized to use their existing check stock, correspondence and business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to their status as debtors in possession. At the time any such Business Forms run out during the pendency of these chapter 11 cases, or otherwise need to be

replaced or replenished, the Debtors will order new Business Forms bearing the "debtor in possession" designation along with the case number.

30. The entry of an order granting the Cash Management Motion is necessary to avoid immediate and irreparable harm to the Debtors and their respective estates. I am also informed that Courts in this District routinely grant the type of relief requested in the Cash Management Motion.

### (ii) Motion to Pay Prepetition Wages, Compensation and Employee Benefits

31. By their Motion Pursuant to Sections 105(a), 363(b) and 507(a) of the Bankruptcy Code for an Order Authorizing Payment of Prepetition Compensation, Benefits and Employee Reimbursements and Granting Related Relief (the "Employee Wage Motion"), the Debtors seek an order of the Court authorizing them to: (i) pay certain prepetition employee wages, salaries, and other compensation earned within the 180 days before the Petition Date, (ii) pay related withholding taxes, (iii) honor all employee reimbursement requests in regard to prepetition business-related expenses incurred, in the manner consistent with prepetition practices, (iv) honor all employee benefit programs and make payments in connection therewith and (v) issue new postpetition checks on account of wage, benefit and reimbursement checks issued prepetition that may be or may have been dishonored. The Debtors further request that Sovereign Bank -- the bank at which the Debtors maintain the Bank Account -- be directed to honor all checks issued on the applicable account prior to the Petition Date to the extent sufficient funds are on deposit therein.

32. The Debtors seek such authorization because, absent an order granting the relief requested in the Employee Wage Motion, the Debtors' employees will suffer hardship and, in many instances, financial difficulties, as the amounts in question are needed to enable certain of the Debtors' employees to meet certain of their financial obligations. Moreover, if any of the

employees are not paid in accordance with the Debtors' prepetition practices, the stability of the Debtors' business operations will be undermined -- likely, irreparably -- by the very real possibility that employees otherwise loyal to the Debtors will seek employment elsewhere. Morale would also be severely, if not permanently, undermined.

33.    As of the date hereof, the Debtors employ approximately nineteen (19) employees. To minimize the personal hardship on such employees, the Debtors seek authority to pay certain prepetition claims for, among other things, wages, salaries, commissions, vacation and other paid leave, federal and state withholding taxes, payroll taxes and payments under employee benefit plans that the Debtors usually pay in the ordinary course of their business, and to continue to pay such obligations as they arise in the ordinary course.

### (a)    Payroll and Withholding

34.    Prior to the Petition Date, and in the ordinary course of business, the Debtors' employees were paid semi-monthly on the 15th and last day of each month. The Debtors' last payroll was processed and distributed on April 30, 2010, and the next payroll is due on May 15, 2010. Although most of the employees receive their pay via direct deposit, a portion of the employees receive paper checks. As of the Petition Date, the Debtors estimate that their employees are owed, in the aggregate, approximately $63,123.90, comprised of (i) accrued but unpaid prepetition wages for employees and (ii) checks distributed on prior to the Petition Date (some of which may still be uncashed). No employees are owed in excess of $10,950 for unpaid wages for the prior 180 days

35.    I am informed that, pursuant to section 507(a)(4) of the Bankruptcy Code, employees are entitled to a priority claim of up to $10,950 for earned but unpaid wages, salaries and commissions. Accordingly, it is my understanding that such amounts would ultimately have

to be paid to the employees in full under a plan of reorganization in any event. None of the Debtors' employees are owed sums in excess of the $10,950 cap.

36. In the normal course of their business, the Debtors are required by law to withhold from their employees' paychecks certain federal, state and local income taxes, and social security and Medicare taxes, and remit the same to the appropriate taxing authorities. In addition, the Debtors are also required to make certain federal contributions based upon an employee's salary (*e.g.*, employer's share of FICA taxes) (collectively, the "Payroll Taxes"). The Debtors estimate that the average amount of Payroll Taxes per month is approximately $7,768.00. The Debtors request permission to continue remitting all Payroll Taxes, whether accrued prior to, or after, the Petition Date, as and when due. As of the Petition Date, the Debtors do not hold any Payroll Taxes to be remitted to the taxing authorities, but approximately $3,600.00 in Payroll Taxes has accrued for the next pay period.

37. Overall, as of the Petition Date, the Debtors owe a total of $66,723.98 for all wages, employee withholding taxes and the employers' portion thereof.

### (b) Benefits and Related

38. In the ordinary course of business, and as is customary in the industry, the Debtors offer their employees various benefits, including medical and dental coverage, flexible spending accounts, vacation, sick time, workers' compensation, short term disability, and other similar benefits.

39. In the ordinary course of their business, the Debtors offer their employees various benefits, including medical and dental coverage, vacation, sick time, workers' compensation, long-term disability, life insurance and other similar benefits.

40. All benefits are paid by the Company. In addition, the Debtors estimate that they owe employees approximately $13,800 for accrued vacation time earned within the 180 days before the Petition Date.

41. The Debtors also maintain a long-term disability plan from UNUM for their employees. As of the Petition Date, the Debtors are current on their long-term disability premium payments.

42. The next premium payments for the other employee benefits will be due on June 1, 2010 in the approximate amount of $17,000.

43. The Debtors request authority to make these payments, in the ordinary course of business, as and when due.[3]

### (c) Worker's Compensation and General Liability Insurance

44. The Debtors maintain an umbrella insurance policy that includes worker's compensation, general liability, automobile, property and worldwide coverage with Zurich American Insurance Co. (Policy Number XXXXXXXX61 00) pursuant to which premiums through May 30, 2010 have been paid. The next annual premiums will be paid on or before June 1, 2010.

45. The Debtors also have employment practices liability coverage with Philadelphia Indemnity Insurance Company (Policy Number XXXXXX8763), pursuant to which premiums of $1,939 been paid through June 18, 2010. The next annual premium will be paid on or before June 18, 2010.

---

[3] The Debtors typically pay earned but unused vacation pay to their employees upon separation. In light of the filing of these chapter 11 cases, upon separation, the Debtors will only pay the portion of vacation pay earned within the 180 days prior to bankruptcy, taking the $10,950 cap into effect. The Debtors do not seek authority to make lump sum payments of vacation amounts at this time. Rather, the Debtors merely seek authority to pay such amounts – in accordance with the terms of the Bankruptcy Code, and customary business practices – upon separation.

### (d) Business Expenses

46. The Debtors customarily reimburse their employees who incur a variety of business expenses in the ordinary course of the Debtors' operations. Because the employees do not always submit claims for reimbursement promptly, it is difficult for the Debtors to determine the amounts outstanding for such reimbursements at any particular time. However, such reimbursements include amounts related to travel (such as transportation and lodging), car rental, meals and business entertainment. As of the Petition Date, there is approximately $22,186.98 in outstanding reimbursement requests unpaid.

### (e) Severance Payments

47. As of the Petition Date, the Debtors offered discretionary severance payments to employees (the "Severance Payment"). Upon separation from the Company, full time employees were offered between one and two weeks of salary of severance based on years of service with the Company.

48. The Debtors' Severance Payment obligations arise in the ordinary course of business and are necessary to sustain employee morale during the pendency of these cases. The Debtors believe that continuation of this program is advisable for the time being, but reserve the right to make modifications in the event such becomes necessary or otherwise advisable in the Debtors' business judgment. Although the Debtors seek to honor their Severance Payment obligations in the ordinary course of business operations and at their sole discretion, the Debtors are not seeking the assumption of any underlying contracts.[4] Further, I am aware of the strictures of section 503(c)(2) of the Bankruptcy Code, enacted as part of the Bankruptcy Abuse

---

[4] The Debtors do not at this time seek to honor any severance obligations arising pursuant to any written employment agreements and such obligations are not covered by this Motion.

Prevention and Consumer Protection Act of 2005. The requested relief does not apply to any of the Debtors officers, directors or insiders.

49. The Debtors cannot reasonably estimate the amount of actual Severance Payment obligations that would arise or be paid in connection with their ongoing business operations and, at the present time, no Severance Payment obligations are owing. To date in 2010, the Debtors have to date paid approximately $12,000 in Severance Payments. The Debtors are seeking authorization to honor, in their discretion, Severance Payment obligations during the pendency of the Chapter 11 cases.

50. Finally, with respect to the prepetition compensation, benefit, and reimbursement amounts that have been paid but remain outstanding, the Debtors request that Sovereign Bank be directed to honor such checks. Because Sovereign Bank would normally be prohibited from honoring any prepetition checks, Sovereign Bank should be directed to honor checks written specifically for payroll, taxes and benefit payments are made.

51. The Debtors respectfully submit that the total amount to be paid to the employees pursuant to the relief requested in the Employee Wage Motion is *de minimis* when compared with the importance and necessity of maintaining employee morale and the loss in value the Debtors (and, by implication, their creditors) will suffer if those amounts are not paid.

52. Immediate entry of an order approving the relief requested in the Employee Wage Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates. I am informed that, in other chapter 11 cases, courts in this District have routinely approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to those described in the Employee Wage Motion.

### (iii) Motion for Authorization to (i) Incur Debtor in Possession Financing, (ii) Use Cash Collateral, (iii) Provide Adequate Protection and (iv) Related Relief

53. By their Motion (i) for Interim and Final Orders (A) Authorizing and Approving (1) Debtor in Possession Financing Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), (2) the Use of Cash Collateral and the Grant of Adequate Protection Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b) and (3) Modification of the Automatic Stay Under Section 362 of the Bankruptcy Code, and (ii) Scheduling a Final Hearing and Approving Form and Manner of Notice Thereof (the "DIP Financing Motion"), the Debtors seek interim and final authorization to borrow under the DIP Facility, use the Cash Collateral of the Prepetition Lenders, and provide adequate protection to the Prepetition Lenders. The Debtors seek interim authorization for interim DIP financing and interim cash collateral usage as soon as possible, followed by entry of final DIP financing and cash collateral orders in the time period contemplated by Bankruptcy Rule 4001(c) and as the Court's calendar permits.[5]

54. The financing under the DIP Financing Motion, which seeks authorization to borrow up to $2.0 million on a final basis, will be provided by BICO and will be senior in priority to the Prepetition Secured Debt and the liens in respect thereof. The DIP Financing Motion sets forth in detail the terms of the proposed DIP financing and the terms of the proposed adequate protection to be provided to the Prepetition Lenders.

55. On an interim basis, the Debtors estimate that their cash needs will be approximately $1.0 million to operate the business. The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral in order to allow the business to continue

---

[5] In addition to the matters expressly set forth in the DIP Financing Motion, the Debtors also request that the Court authorize and approve other customary terms typically approved in connection with DIP financing and cash collateral matters, as more fully set forth in the Interim DIP Order and the Interim Cash Collateral Order.

uninterrupted, preserve their going concern value, make payroll and satisfy other working capital and general corporate needs. Without access to the proposed DIP Facility and use of Cash Collateral, the Debtors' liquidity will quickly dry up, harming operations and the value of the business. In contrast, the value of the Prepetition Lender's interest in its collateral will be preserved, if not increased, by the DIP Facility and use of Cash Collateral because it ensures the uninterrupted continuance of the Debtors' operations which will generate cash and preserve the Debtors' enterprise value.

56. The terms and conditions of the DIP Financing have been negotiated at arms' length and in good faith by the Debtors and the DIP Lender. The terms and conditions of the DIP Financing are fair and reasonable under the circumstances and reflect the most favorable terms upon which the Debtors could obtain the necessary funding.

57. Prior to the Petition Date, the Debtors contacted several sources of potential funding and none were willing to provide a DIP loan that was junior to the Prepetition Secured Debt. Thus, despite their prepetition their efforts, the Debtors have been unable to (a) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, (iv) without granting priming liens with respect to the Prepetition Lenders pursuant to section 364(d) of the Bankruptcy Code, or (b) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than the proposed DIP Financing.

58. The Debtors propose to provide the Prepetition Lenders with the following adequate protection: superpriority claims and replacement liens with such (a) superpriority

claims to be senior to all other postpetition superpriority claims except the superpriority claims granted to the DIP Lender and (b) replacement liens on all of the property now owed or hereafter acquired by the Debtors, whether or not subject to any other liens, with such liens to be subordinate only to the liens of the DIP Lender. The Debtors believe that this proposed adequate protection should be approved.

### C. Retention of Professionals

59. The Debtors will file applications to retain the following professionals (collectively, the "Applications"): (i) Andrews Kurth LLP as general bankruptcy counsel to the Debtors and (ii) Wick Phillips Gould & Martin LLP as special litigation counsel to the Debtors. I am informed that these retention applications would not be considered on a "first day" basis due to recent changes to the Bankruptcy Rules. However, I believe that these professionals are well suited for this engagement given their respective experience and expertise in chapter 11 matters generally, and their familiarity with the Debtors and their operations. For the reasons set forth in the Applications, the relief requested therein should be approved when presented to the Court.

### IV. CONCLUSION

60. As a result of the above, I respectfully request that the Court grant all relief requested in the First Day Motions, along with any and all other and further relief that the Court may deem to be just and proper.

61.　I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 11th day of May, 2010.

　　　　　　　　　　　　　　　　　*[signature]*
　　　　　　　　　　　　　　　　　Roy C. King
　　　　　　　　　　　　　　　　　Chief Executive Officer